UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
COVINGTON

CIVIL ACTION NO. 2:20-CV-00063-EBA

TIMOTHY S. SUDEITH,                                                                         PLAINTIFF,


V.                              **MEMORANDUM OPINION & ORDER**


E&J TRAILER SALES
AND SERVICE, INC., *et al.*,                                                          DEFENDANTS.


\*\*\* \*\*\* \*\*\* \*\*\*

Timothy S. Sudeith seeks compensation for injuries sustained when a tractor trailer merged into his lane on Interstate 75, striking his vehicle. He retained Dr. Justin M. King, Psy.D., LP, a to testify about his vocational functioning. [R. 74, pg. 16]. Dr. King expressed his opinion that Sudeith "sustained a significant diminution of occupational opportunity and earning capacity" as a result of injuries sustained in the accident, and estimated lifetime lost earnings as a result. Both parties agree that Dr. King is not qualified to offer neuropsychological or medical opinions, and Defendants move to exclude opinions and testimony which they claim are neuropsychological or medical in nature.  Additionally, Defendants assert that he is not qualified to rebut opinions set forth by Defendants' neuropsychological expert.

### A. Admissibility of Dr. King's Opinions and Testimony

Defendants ask this Court to exclude King's testimony, asserting that his opinions "rel[y] entirely on bad information and assumption" or "require a medical or neuropsychological background[.]"  [R. 76 at pg. 14].

Fed. R. Evid. 702 permits testimony relating to technical or specialized knowledge where it will assist the trier of fact to determine a fact in issue. As a prerequisite, such evidence must meet the following criteria:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702(a)–(d); *see also* Fed. R. Evid. 702, Advisory Comm. Note to 2000 Amendment ("[N]o single factor is necessarily dispositive of the reliability of a particular expert's testimony.").

Defendants concede that Dr. King's report, opinion, and testimony may satisfy the first requirement under Rule 702, stating that "it is possible" that Dr. King's expertise as a licensed psychologist and vocational evaluator may help the jury understand Sudeith's claimed injuries and evaluate which damages are attributable to the April 26, 2019 collision. [R. 76 at pg. 17]. However, they argue that he is not qualified to offer neuropsychological or medical opinions, that he relied on insufficient factual data, and that his principles and methods of evaluating Sudeith's claims are inadequate to support his opinions and testimony. Therefore, the Court must consider King's qualifications, the reliability of his opinions, and, finally, his principles and methods.

### *Qualifications*

King is a licensed psychologist with a bachelor's degree in psychology and a doctorate in clinical psychology. [R. 74-2 at pg. 1]. He holds Advanced Graduate Certificates in Rehabilitation Counseling and Forensic Vocational Rehabilitation. [*Id.*]. He has been a licensed psychologist in the state of Minnesota for nine years, a Certified Rehabilitation Counselor for seven years, and a Professional Vocational Evaluator for seven years. [*Id.*]. In 2017, he earned an International Psychometric Evaluation Certification. [*Id.*]. Dr. King is the owner of Metropolitan Rehabilitation

Services in Minneapolis, Minnesota ("Metropolitan"). [*Id.*]. Prior to taking that role, Dr. King worked at Metropolitan in a consultative role beginning in 2013 conducting pediatric evaluations for pediatric loss of earning capacity claims. [R. 74-1 at pg. 8]. He was hired as a Metropolitan staff member in 2014, and then assumed the role of owner in 2015. [*Id.* at pg. 7]. Before working at Metropolitan, he was a Post-Doctoral Fellow at Language and Learning Specialist in Golden Valley, Minnesota, "assessing various conditions, [such as] learning disabilities, ADHD, autism spectrum disorders, and even post-concussive symptoms." [*Id.* at pg. 8]. By Dr. King's own account, most of his work has been conducting vocational evaluations of individuals who have been injured. [*Id.* at pg. 8–9].

The record demonstrates that King has the requisite educational and professional experience to offer expert testimony on matters related to vocational evaluations and psychology. He possesses scientific, technical, and other specialized knowledge that may assist the jury weigh the impacts of physical and psychological conditions upon vocational abilities, a factual issue related to Sudeith's claims. Thus, the Court finds that Dr. King can offer testimony to assist the jury to understand evidence related to psychology and vocational aptitude as required by Fed. R. Evid. 702(a).

### *Reliability of Dr. King's Opinions*

#### a. Facts and Data

Defendants argue that Dr. King did not consider Sudeith's medical history of Attention Deficit/Hyperactivity Disorder, and dyslexia, [R. 76 at pg. 5–6], and did not consider the accommodations for ADHD and dyslexia he received prior to the accident, [*Id.* at pg. 6]. Consequently, the Court must consider whether his opinions and testimony relating to Sudeith's lost future earnings rely upon sufficient facts and data, as required by Fed. R. Evid. 702(b).

Dr. King first reviewed medical records provided by Sudeith, including Park Nicollet, the

Minnesota Clinic of Neurology, and Bright Eyes Vision Clinic.  [R. 74-1 at pg. 17].  He formed opinions as to Sudeith's vocational abilities by administering "vocational/psychological tests": Wechsler Adult Intelligence Scale-IV, Wide Range Vocabulary Test, Nelson Denny Reading Test, Wide Range Achievement Test (Math4), Minnesota Multiphasic Personality Inventory-2, Dot Counting, and a Career Assessment Inventory.  [R. 81 at pg. 3].  He also performed a Work Evaluation, "a method of assessing a person's vocational aptitude through the use of simulated work tasks." [*Id.* at pg. 8].  During the testing and Work Evaluation, Dr. King observed Sudeith's behavior noting physical and psychological behaviors in addition to Sudeith's self-reported comments and complaints.  [*Id.* at pg. 12–18].  When authoring his report, Dr. King consulted the Minnesota Department of Employment and Economic Development for wage data.  [R. 74-1 at pg. 35].  He relied on five years of personal tax records provided by Sudeith.  [*Id.* at pg. 87].  Dr. King's report also noted that he examined personal observations made by Mr. Sudeith's wife.  [R. 81-1 at pg. 22].

Based on the above, Dr. King relied on sufficient facts and data in forming his conclusions. Although Dr. King did not review medical records relating to Sudeith's previous diagnoses of ADHA and dyslexia, and Dr. King admitted that such diagnoses "can be impactful in a vocational opinion," [R. 74-1 at pg. 55], the other facts and data are sufficient for the formation of a reliable opinion.   Dr. King's opinion does not appear to solely rely upon "subjective beliefs and unsupported speculation."  *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800–01 (6th Cir. 2000). This Court previously found that a vocational expert relied on sufficient facts and data by using a personal interview of the plaintiff and a review of the plaintiff's medical records.  *Oaks v. Wiley Sanders Truck Lines, Inc.*, No. 07-45-KSF, 2008 U.S. Dist. LEXIS 68705, at *7 (E.D. Ky. Sep. 8, 2008).  Moreover, "mere 'weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility.'"  *Id.* at 801 (quoting United States

v. L.E. Cooke Co., 991 F.2d 336, 342 (6th Cir. 1993)).

### b. Principles and Methods

The Court will consider Defendants' arguments with respect to Dr. King's vocational evaluation methodology. Here, Dr. King administered several vocational/psychological tests in order to ascertain Sudeith's vocational abilities. During his deposition, Dr. King testified that there were "hundreds and hundreds, if not thousands, of different tests" that he could have administered, but chose a battery of tests based on Sudeith's accident and reported injuries. [R. 74-1 at pg. 34]. He also stated that the tests he used, including the tests administered during Sudeith's vocational evaluation, are "all peer-reviewed and normed . . . instruments." [*Id.*]. Defendants do not appear to argue that the methodology of the tests themselves are unreliable. Rather, they argue that his methodology in choosing which tests to administer was flawed because Dr. King chose tests based on incomplete information disclosed by Sudeith, including an incomplete medical and work history. [R. 76 at pg. 18]. The attack on Dr. King's methodology is directed at preliminary data collected prior to the evaluation. As stated above, any weakness as to the factual basis Dr. King relied upon when choosing which tests to administer bear on the weight of his opinions, not the admissibility. *See McLean*, 224 F.3d at 801. This aligns with the general rule that courts should permit testimony "based on allegedly erroneous facts when there is some support for those facts in the record." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008).

Second, the Court shall assess Defendants' arguments relating to Dr. King's conclusions about Sudeith's lost future earnings. Defendants point to several flaws in Dr. King's methodology, including his reliance upon one tax year as a baseline for Sudeith's PlayCore income; and his "naked extrapolation" of state average financial data for companies that are different in size, scope, and financial position than Sudeith's real estate company Pilsen Enterprises ("Pilsen"). [R. 76 at pg. 10–11, 19]. Sudeith argues that the metrics Dr. King used to determine future lost earnings for

both incomes were accurate.

Regarding Sudeith's PlayCore income, Dr. King stated in his deposition that he solely utilized Sudeith's 2018 W2, reflecting Sudeith's income in the year prior to the accident, to determine a base income. [R. 74-1 at pg. 87]. Then, using Department of Labor's Bureau of Labor statistics, Dr. King calculated an Adjusted Expected Earnings column to account for employer-paid fringe benefits (equal to roughly 31% of the salary) that are not reflected in Sudeith's income. [R. 74-3 at pg. 33]. Then, Dr. King extrapolated those earnings through the years, ending at the age of retirement. [R. 74-1 at pg. 94]. The age of retirement was based on Sudeith's shortened work life expectancy, which Dr. King deduced through his testing and vocational evaluation of Sudeith. *See* [R. 81-1 at pg. 22]. Dr. King generated three scenarios for retirement ages of 64, 60, and 57. [R. 74-3 at pg. 32].

The Sixth Circuit addressed a challenge to an expert's determination of damages in *Scrap Metal*, deciding that a district court did not abuse its discretion by admitting the expert's testimony when the expert's methodology included relying upon inaccurate data and financial figures. *Scrap Metal*, 527 F.3d at 531. Rather, the Sixth Circuit commented that the district court may "pass[] the torch to the jury" to make determinations regarding the weight of the testimony. *Id.* at 532. Moreover, in the context of future lost earnings, it is generally understood that such figures are "rough and ready" estimates, as many factors can influence one's earnings over a lifetime, such as the rate of inflation. *In re Air Crash at Lexington, Ky.*, Aug. 27, 2006, No. 5:06-CV-316-KSF, 2008 U.S. Dist. LEXIS 52770, at *7 (E.D. Ky. July 2, 2008). The Court is not convinced that Dr. King's sole reliance upon Sudeith's 2018 W2 renders his methodology unreliable, as those tax documents would reflect his income in the year immediately preceding the accident. Further, in determining Sudeith's work life expectancy, he relied on appropriate factors "such as the plaintiff's age, employment record, training, education, ability to work, and opportunities for advancement."

*Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 727 (6th Cir. 2012) (citing Restatement (Second) of Torts § 924 cmt. d (1979)). The Court finds that Dr. King's methodology and application of that methodology to relevant facts with respect to future lost earnings from PlayCore is sufficiently reliable to satisfy Fed. R. Evid. 702(c)–(d).

As to Dr. King's opinions related to Sudeith's Pilsen income, Defendants argue that Dr. King's reliance upon Minnesota Department of Employment and Economic Development salaries for real estate managers created an inappropriate baseline from which to determine future lost earnings. Defendants also argue that Dr. King improperly extrapolated that baseline over time based on the assumption that his real estate business would experience future expansion when Pilsen had not acquired new properties in the 15 years preceding the accident. [R. 76 at pg. 12]. Moreover, by the Defendants' account, Dr. King deduced future lost earnings without considering certain facts, including that Sudeith only operates one commercial property; and that Sudeith spent only four to five hours a week performing work associated with Pilsen pre-accident. [*Id.* at pg. 19]. To this, Sudeith responds that if Dr. King solely relied on pre-accident income generated by Pilsen, he "would have under-evaluated the diminution of [Sudeith's] capacity to earn money from that income source." [R. 81 at pg. 13]. Indeed, Dr. King's opinion regarding Sudeith's future lost earnings are plainly based on the assumption that Sudeith would grow Pilsen. [R. 74-1 at pg. 89] ("[M]y understanding is that he—it was his goal to pursue more real estate development opportunities, and now he's lost that capability."). Based on Sudeith's reported desire to grow his company, Dr. King "provided a[n] [income] range based on [Sudeith's] experience, . . . what he reported his earnings to be, because we don't know exactly what that next unit or what next building would've been." [*Id.* at pg. 92]. The income range was extrapolated not from pre-accident earnings by Pilsen, but solely from a range of salaries from the Minnesota Department of Employment and Economic Development that Dr. King deemed consistent with his vocational

evaluation of Sudeith.

"Departures from actual pre-injury earnings must be justified and cannot be unduly speculative." *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 727 (6th Cir. 2012). The *Andler* court, referencing a case from the Second Circuit, unequivocally stated that testimony based on "unrealistic assumptions regarding the plaintiff's future employment prospects" should be excluded. *Id.* (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)). An expert may form a basis for determining future loss earnings by assessing the individual's "projected salary and years in the workforce," and consulting "actuarial tables, Bureau of Labor Statistics figures, or other averages along with the [individual's] historical earnings." *Andler*, 670 F.3d at 728.

Sudeith insists that "earning capacity is different from actual earnings," and that Dr. King's opinions reflect that the injuries resulting from the accident have led to a diminution in his ability to grow Pilsen, and therefore generate additional income beyond what he made in years previous. [R. 81 at pg. 14]. The Court understands this distinction. However, based on Dr. King's report and deposition testimony, his figures do not use Sudeith's *actual* pre-accident earnings from Pilsen as a starting point for forming his opinions regarding a diminution in earning capacity. Moreover, in addition to using figures that do not reflect any pre-accident earnings, Dr. King assumed a diminution of Sudeith's ability to grow Pilen solely based upon Sudeith's self-reported intentions to expand the business.

The Court's gatekeeping role is not to decide whether an expert's opinion is "correct, but rather to determine whether it rests upon a reliable foundation, as opposed to . . . unsupported speculation." *Scrap Metal*, 527 F.3d at 529–30. Dr. King's failure to consider Sudeith's pre-accident earnings from Pilsen raises the specter of unreliability as to his methodology. Dr. King's opinion is speculative at best, relying upon average salaries of property managers in

Minnesota and Sudeith's reported intentions to grow his business, without considering (1) Sudeith's pre-accident earnings, (2) the growth of Pilsen in the years preceding Sudeith's accident, or (3) evidence that would corroborate Sudeith's intention to acquire new properties and grow Pilsen. The Court finds that Dr. King's methodology to determine Sudeith's future lost earnings from Pilsen relies on "subjective belief and unsupported speculation," is unreliable, and is therefore prohibited by Rule 702. *McLean*, 224 F.3d at 801. Thus, as Dr. King's methodology to generate his opinion is unreliable, the Court shall exclude Dr. King's opinion and testimony as it relates to future lost earnings associated with Sudeith's work at Pilsen.

### DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**A. Standard for Summary Judgment**

Defendants move for partial summary judgment on Sudeith's claims of past lost wages. [R. 75]. Although Sudeith pled past lost wages in his Complaint, [R. 1 at ¶ 53], he now states unequivocally "there are no past lost wages," and he "does not reserve the right to seek damages for past los[t] wages . . . ." [R. 82 at pg. 4]. So, the Court will grant the motion on the past lost wages claim.

Defendants also move for summary judgment on Sudeith's claims of future lost wages, stating that the record does not show that Sudeith suffered a permanent injury and, even if it did, Sudeith fails to demonstrate a loss of future earnings. [R. 75 at pg. 17].

"Future damages 'are those sums awarded to an injured party for, among other things: (1) residuals or future effects of an injury which have reduced the capability of an individual to function as a whole [person]; (2) future pain and suffering; (3) loss or impairment of earning capacity; and (4) future medical expenses.'" *Georgel v. State Farm Mut. Auto. Ins. Co.*, No. 13-57-DLB-EBA, 2016 U.S. Dist. LEXIS 26283, at *8 (E.D. Ky. Mar. 2, 2016) (quoting *Jordan v. Bero*, 158 W. Va. 28, 210 S.E.2d 618, 623 (W. Va. 1974)). To obtain an award of future damages,

a plaintiff must establish two elements: (1) permanent injury and (2) damages to a reasonable degree of certainty. *Id.* (citing *Adkins v. Foster*, 187 W. Va. 730, 421 S.E.2d 271, 274 (W. Va. 1992)).

Under Rule 56, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Such a motion then "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). This is so because "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Id.* at 323–24. To avoid summary judgment, the non-movant must come forward with evidence on which a jury could reasonably find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The following factors bear consideration by a court when entertaining a motion for summary judgment:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

6. As on federal directed verdict motions, the "scintilla rule" applies, *i.e.,* the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 324. When reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251-52). "[T]he existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Sutherland v. Mich. Dept. of Treasury*, 344 F.3d 603, 613 (6th Cir. 2003) (citing *Anderson*, 477 U.S. at 251). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)). In such a case, summary judgment is warranted. *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010); *Celotex,* 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

## B. Future Lost Earnings

Defendants argue that the evidence fails to demonstrate that Sudeith sustained a permanent injury and, under Kentucky law,[1] a plaintiff seeking damages for permanent impairment of future earning power must "show with reasonable probability that the injury sustained is permanent." *Reece v. Nationwide Mut. Ins. Co.*, 217 S.W.3d 226, 230 (Ky. 2007). They cite to statements by Sudeith's treating physician, Dr. Van Hee, noting gradual improvements of Sudeith's conditions. [R. 75 at pg. 17]. They indicate that Dr. Van Hee's recommendation that Sudeith return to work for seven hours a day, or more if he is able, evidences that his injuries are not permanent. However, Dr. Van Hee's report and deposition testimony indicate that Sudeith's symptoms, while improved, persist and inhibit his ability to function in the workplace as he did prior to the accident. However, Defendants acknowledge that both Drs. Van Hee and King agree that that Sudeith has suffered "some level of permanent injury," but discount the weight of those opinions because each physician admitted that they did not review the entirety of Sudeith's medical history. [R. 75 at pg.17]. As a result of testimony indicating a permanent injury, the Court finds that there remains a genuine dispute of material fact about whether Sudeith's injury or injuries are permanent.

Second, the Court likewise finds that there remains a genuine dispute regarding Sudeith's

---

[1] "Under the *Erie* doctrine, state law must provide the substantive legal principles in a diversity case, while federal law governs procedure." *Losey v. N. Am. Philips Consumer Elecs. Corp.*, 792 F.2d 58, 61 (6th Cir. 1986). "The law of tort liability and damages is substantive law . . . ." *Id.* at 62. This Court sits in diversity over Sudeith's common law and Kentucky law claims. Accordingly, Kentucky law shall govern the standard for pleading damages in this action.

claim of future lost earnings damages, as "a permanent injury may not always result in permanent impairment of earning power." *Cooper v. Steak N Shake, Inc.*, No. 5:18-CV-417-EBA, 2019 U.S. Dist. LEXIS 178665, at *21 (E.D. Ky. Oct. 16, 2019).   Defendants argue that, even if Sudeith's injuries are permanent, his injuries have not "resulted in some diminution of his ability to earn income in the future."  [R. 75 at pg. 17].  They point to Sudeith's multiple pay raises after the accident, high performance reviews, and his apparent ability to meet expectations at PlayCore. However, both Drs. Van Hee and King state that, despite any success Sudeith enjoys at work, he is unable to work as he did prior to the accident.

As discussed at length above in the context of Defendants' Motion to Exclude, [R. 76], the Court found that most of Dr. King's opinions as to Sudeith's future lost earnings complied with Rule 702.  As some of his opinions on lost future earnings are admissible, there remains a genuine disagreement among Dr. King and Defendants' experts regarding Sudeith's asserted lost future earnings.   Importantly, this Court has recognized that "members of the jury 'are capable of determining, from the evidence and their common knowledge and experience, whether there has been a permanent impairment, the extent of such impairment, and *the value of such impairment*." *Napier v. Cincinnati Ins. Co.*, No. 14-171-GFVT, 2015 U.S. Dist. LEXIS 145185, at *6 (E.D. Ky. Oct. 27, 2015) (quoting *Reece*, 217 S.W.3d at 230–31) (emphasis added).  Viewed in a light most favorable to Sudeith, there remains ample dispute about Sudeith's alleged loss of earning power and resulting lost future earnings.  Thus, such questions about the damages arising from Sudeith's injuries are better suited for submission to a jury.

## CONCLUSION

For the reasons stated herein, the Court finds that Dr. King's opinions and testimony as to lost future earnings related to Sudeith's future lost income with Pilsen should be excluded as not meeting the requirements set forth by Fed. R. Evid. 702 or *Daubert*.  However, his other opinions

and testimony are generally admissible as consistent with this Opinion.  The Court will further grant in part Defendants' Motion for Partial Summary Judgment as it pertains to Sudeith's claims of past lost wages, as it is undisputed that Sudeith has not lost any past wages as a result of his accident or resulting injuries.  Accordingly,

    **IT IS ORDERED** that:

1.  Defendants' Motion to Exclude [R. 76] is **GRANTED in part and DENIED in part,** consistent with this opinion**;**

2.  Defendants Motion for Partial Summary Judgment is **GRANTED in part and DENIED in part,** consistent with this opinion.

    **IT IS FURTHER ORDERED** that the parties shall appear telephonically before the undersigned for a Telephonic Conference to appear **ON THE RECORD**, originating from Lexington, on **April 3, 2023 at 2:00 P.M.**  The parties' counsel shall access the conference by calling Microsoft Teams Audioconferencing at 606-371-5577 and entering the Phone Conference ID 867 441 798 (followed by #).  **On or before Friday, March 31, 2023**, counsel shall provide the undersigned separate written statements of no more than three (3) pages in length, setting forth their positions on the status of this case, available dates for trial, and the anticipated length of trial. Transmissions may be sent by email atkins_chambers@kyed.uscourts.gov, with service on opposing counsel.

    Signed March 15, 2023.



**Signed By:**

**_Edward B. Atkins_**

**United States Magistrate Judge**